Good morning. May it please the Court, my name is Celeste Butera from Hoffman & Barron, and I represent Appellant Westmont Living, Inc. In this trademark infringement action, the District Court committed clear error. The District Court failed to consider, weigh, or even apply any of the nine likelihood of confusion factors that this Court has established through many different precedent, the RxD decision, Variety Stores, Sara Lee, and Rosetta Stone, just to name a few. The District Court also committed error by ignoring and failing to credit the factual evidence in the record, which clearly showed that seven of the nine likelihood of confusion factors weighed heavily in favor of finding likelihood of confusion. Do we, in looking at this court's Whataburger case, do we need to consider those factors? Shouldn't we first consider the Don Donut? And then if that issue is, if injunctive relief is not right, then consider the other factors? No, Your Honor. I think that the proper test is to first look at the nine factors. Because the Don Donut decision is really quite limited to its specific facts. And as the decisions from this court clearly state, every trademark infringement case is so dependent on the facts that are at play. In Don Donuts, there are a number of reasons why it just simply doesn't apply. First, it's really important to understand that the plaintiff in that action never advertised for retail sales by using its trademark in the area where the defendant was selling retail donuts. And it's also important to remember that Don Donuts was decided in 1959, and that was before the Second Circuit set forth its eight factors for determining likelihood of confusion in the Polaroid case. The Polaroid case has eight factors that are very similar to the nine factors that are determined in this district by this court has said. These are the nine factors that must be determined and looked at, and the facts must be applied to those factors. Now, the other reason why the decision in the Second Circuit from Don Donut is not applicable and why it does not change the test on likelihood of confusion at all is because there was no Internet advertising there. There was no reach between the two trading areas of the plaintiff and the defendant there. There simply was no reach beyond the geographic location of where they were operating. Actually, the court made that the point. It said as long as the plaintiff and defendant can find their use of the mark Don in connection with the retail sale of baked goods to their present separate trading areas, it is clear the public confusion had happened. That is absolutely right. It seems to me that we have to answer the first question. This is the second element, basically. Was there a likelihood of confusion? It seems to me Don is just one of the tools that can be looked at for determining the likelihood of confusion. Just to add on to Judge Benjamin's question, really, the question is can you determine the likelihood of confusion on market area alone, or do you need the factors? Of course, even the market area in this case could be a question because retirement communities seem to be national in scope. People move to other states for retirement and assisted living based on whether their children are there or whether it's warmer climate or whether they're returning to their childhood homes or a bunch of other factors. And so that somebody from Maryland, where I am, might well go to Florida for retirement at a resisted living for climate purposes. And I can tell you it's also for tax purposes. But these are complex factual questions about whether the evidence of likelihood of confusion, it seems to me. I very much agree with everything that you've said, Your Honor. I'm not determining your case, but I'm talking about general principles of trademark law. One hundred percent. The market conditions are so critical. And the nine factors that this Court has set forth in its precedent go directly to the heart of that question. How are the marks seen in the particular market area and in the particular industry? And as you point out, retirement living services, the record evidence here from testimony, both from Westmont, the appellant and the appellee, clearly state that the reason they do target nationally, the reason that the websites do reach in every single state in the country, is because that's precisely what residents do. They do look to retire in different states because they want to be near their children or their grandchildren. Or they want a better climate. Or they want to play a lot of golf. Or they just want to have a better life. And so that's why what you see in the record is this pervasive Internet advertising scheme by both. But these pervasive campaigns on Google, for example, the Google searches, they both have advertising on Google. And when customers from all the states in the union see those advertisements, they're confused. Because Westmont appears on the left side of the page, and then the Westmont at Short Pump facility appears on the right-hand side of the page. There's testimony in the record from appellee that they don't limit any of their of course we know that the Internet is not limited. It reaches wherever anybody can access a computer. And so you're right. The market conditions dictate here. And what the market conditions here show is that both sides are advertising nationally. Importantly, I think what was missed here is that Westmont at Short Pump advertises extensively in California. They have repeated residents that have been referred to them by a place for mom from California. They're obviously all of their advertisements from their websites are directed to residents in California and Oregon. There are Google analytics which show how many thousands of people from California access. In fact, it's one of the top ten states of potential customers where those customers access the Westmont at Short Pumps website. So it is very pervasive and national. Based on the record, I think the referrals are very, I think it's what, one referral from one group and maybe five, four, five other referrals? No. So the California referrals are significant in the record. The senior vice president of marketing from RUI testified that a place for mom has referred many California residents. And there's also a listing in the record. And I can give you- Can you be a little more specific as to, because what I'm looking at in the JA, as to a number from a place for moms was a lot less than many. Sure. It's JA 4554 to 4558. 4585 to 4606. And there are another, I just have one more, if you don't mind, I can just quickly look it up. And JA. Sorry, it's on my other page. But I will get it for you because I have it here. Because what I have- I'm sorry. So there's one referral from a place for mom and then five unique referrals from a place for mom at JA 4585. That's also one of the references. And then there's also 4594 to 4606. And these are all referrals from residents that lived in California and that were being referred to the Westmont at Short Pump in- Vice versa is true, too, because apparently Westmont Living has customers from the East Coast in their facilities. But it seems to me that's sort of consistent with the notion that retirement living is not a localized business. And the donut case, the court was focused, said there would not be a likelihood of confusion because, number one, these were bakery goods that had an area of about 25 miles. And, number two, they only used their mark locally in connection with the retail sales. There was no expansive advertising. And in that sense, the court said no likelihood of confusion. But in this case, I thought there was evidence of actual confusion, which I've never seen in a trademark case where actual confusion wasn't redressed. It doesn't matter whether it's a small amount. Companies can grow. But when there's actual confusion in marketing, that's at the heart of the whole trademark issue. That's exactly right, Your Honor. And the record evidence is clear that there were at least 20 residents from Virginia that moved to the Westmont's facilities in California. And that can be found at JA3483, JA3485. And also, tens of thousands of Virginia residents access the Westmont Leopolis websites. And those are at JA4526 to 25 to 26 and JA3485 to 3486. So you are 100% correct, Your Honor. These are not localized businesses in any sense of the word. These pervasive marketing campaigns are focused on the Internet advertising. And the residents have. There have been residents from California that clearly go to live at the facility Westmont at Shore Pump. And there have been many Virginia residents that have gone to live over in Westmont's facilities in California. So you are 100% correct. Now, with respect to actual confusion, which you raised, that's correct. Westmont put forth into the record the consumer survey by Dr. Marinik. And that survey found a confusion rate of 34.8%. People seeing the two marks together were confused that the Short Pump facility, Westmont at Shore Pump, actually originated from a Pele, Westmont. 57.3% of consumers surveyed said they believed RUI's Westmont at Shore Pump facility was associated or affiliated with Westmont. These rates of consumer confusion, as you point out, clearly constitute compelling evidence of likelihood of confusion on summary judgment. This court has said repeatedly in its precedent that a confusion rate of 17% is enough to have actual confusion on summary judgment. And therefore, as Your Honor points out, when you have actual confusion, that's the best test for likelihood of confusion. It's compelling evidence. And it makes perfect sense here. Of course consumers are going to be confused. If you see Westmont Living and then Westmont at Shore Pump, the parties are engaged in the same exact services. The parties are both national in scope. The parties compete for potential customers on the Internet. Of course it makes perfect sense that we're going to have these incredibly high confusion rates, which is quite dispositive on likelihood of confusion in trademark cases. Now, RUI will criticize the Maronich expert report by saying that, oh, well, it wasn't done properly the manner in which it was done. That is a factual question 100%. It's a question for the jury, Your Honor. It's not something that the district court should be looking at. It's a totally credibility issue, and those are reserved for the jury. This case was decided on a motion for summary judgment. Clearly there's overwhelming evidence here of likelihood of confusion. And it's at the very least, it's our position that summary judgment, based on all of the factors weighing so heavily in favor of likelihood of confusion, that summary judgment should have been granted here to Westmont. However, at the very least, these questions, in fact, must go to the jury. These are jury questions for them to decide. To me, though, I'm not sure what our role could be. It seems to me that we have set out several, well, nine factors in our most recent opinion, I think, that Judge Floyd wrote. And those factors ought to be considered in determining the likelihood of confusion. And they were not in this case. And so it seems to me if we do have this interchangeability, potential competitiveness, we ought not to step in and draw any conclusions other than to let the court make the complete analysis and assessment, right? Well, I think in a case such as this where the record evidence overwhelmingly weighs in favor of likelihood of confusion, this court has said in those exceptional cases, the court can reverse and grant summary judgment to the party where that- What's the best case on that? Where did we do that? Well, RxD says it. Rosetta Stone says it. And RxD, Variety as well. But I agree with Your Honor, if the factual issues are not so overwhelming as they are in this case, then the case does need to go back to be evaluated by the jury because of the factual questions. Mr. Long, we'll hear from you. Thank you. Thank you. Thank you, Your Honors. Please the court. I'm Josh Long of Woods Rogers. And with me today is my colleague, Gavin Rowe, also from Woods Rogers. Your Honors, one thing that respectfully may be lost in this analysis is likelihood of confusion is only determined in the relevant market. And the only relevant market is where the Westmont at short pump, that one facility, operates, and that is- Is it the market, the Internet? The market, Your Honor, absolutely not. The Internet is a communication tool. The market is where the Westmont at short pump operates, where it actively markets, and where it performs and provides its products and services. Where it solicits and obtains customers and income. And there could be hardly a more national type of business than the retirement and assisted living business. I mean, I can't tell you how many friends I know that have gone out of state to be with family and friends. They want to go to Maine. They go to Florida. They go to Hershey, Pennsylvania. They go out into Ohio. These compete everywhere. I get ads directly because of my age, I guess, from places that are outside the state soliciting assisted living. And in this case, not only is the market national, the evidence is that there is an interchange. There are actually customers going from Virginia to California to serve in these, and some of the Californians coming into your facility. And so this idea that this operates like a donut shop, where the only advertising was from the donut retail facility, and there was no marketing beyond that, and that's what the donut case talked about. We had the hamburger case, the Texas hamburger case. You have a hamburger joint that had no people go that locally in Texas. And the one in the Fourth Circuit, we found, was in a totally different market. But we've never had anything like this, where you have actual confusion. If you go online, both facilities end up appearing. Your Honor, may I attempt to unpack that? You have an expert that has pointed out the confusion. That's the typical evidence that creates likelihood of confusion. And likelihood of confusion, and that's what Judge Lombard said in his case. He talked about no likelihood of confusion because there was no marketing beyond the store. And he said also that was fortified by the fact that the bakery would have about a 25-mile radius because of the nature of the product. But he explicitly conditioned it on the fact that they can find the use of their mark to the retail store where people go, and that there was no evidence that they were expanding. But that's not what we have here. We have advertising soliciting people wherever they will come from, and to preclude our nine factors on the likelihood of confusion with a finding. It seems to me this is a factually intense question anyway on summary judgment. It may be a problem, doesn't it? Your Honor, no, and I want to unpack all that and address all the things you just raised if I'm able to recall them. As a starting point, looking at the law, that is exactly what Whataburger, Lone Star, and Pizzeria Uno did. You better go back before even those cases. You better go back to the elements of a violation. And the element we're talking about in this case is the likelihood of confusion. Correct, Your Honor. Likelihood of confusion in the relevant market. It doesn't have to be a relevant market. It has to be in a market in which two people compete. This is not an antitrust case. What we're looking at is where they compete with each other so that consumers seeking that service or what will be confused. We're talking ultimately about the goodwill and income that derives from using the mark, and that's connected with the service. So if they compete in Nebraska, both of them compete in Nebraska for people, there can be a likelihood of confusion. In the market in which the defendant, junior user, Hear Us operates. And, Your Honor, to answer your questions, Judge Young looked at all this. He recognized all this. He analyzed the Internet. He analyzed the statistics. He found it to be de minimis. In the Internet age, by definition. Where do we have a principle of de minimis? It seems to me likelihood of confusion is a factual question. It has to be determined by nine factors. And none of the nine factors were considered. They were preempted based on his conclusion that there were two separate markets here. He preempted the whole analysis by making a factual conclusion that the markets were separate. In my view, he looked at everything on summary judgment on cross motions, all of which was submitted. That's what he ruled on. He ruled on only one thing, and he ruled on it as a matter of law. Correct, because he determined based on the facts that just like in Whataburger, just like in Lone Star, just like in Pizzeria Uno, just like in this court's more recent decision in Ray Communications. If he's basing it on the facts, you start off with the fact that they're both using the same word. That word is true, Your Honor. And they're both using the same structure, the word Westmont at a particular location. They're both in the retirement community, and they both have physical structures. Their buildings, when you go online, they almost look identical, the big circular drive with the section area. And then you have evidence presented that there's a very high likelihood of confusion, way above what we've ever considered in our cases. And, Your Honor, I want to unpack that. Let's talk first about revenue, residents, and the market. Judge Young analyzed all this. They provided raw numbers. He looked at the percentages, and percentages are what matter in a big world. It's not the number. It's the number relative to the entire country. 1.75 percent of their website traffic came from Virginia, only 1.75 percent, 0.129 percent of their revenue. It's not just Virginia. They had 20 people come from Virginia for their buildings, but it is the whole country. The question is how many people came from Nebraska, how many people came from Kentucky, how many people came from Florida. The fact is, your argument is they're confined to the West Coast. That's their own statements, Your Honor, repeatedly in broadcasts. Their buildings are on the West Coast, their facilities are. But their marketing effort and their competitiveness, where they're getting money deriving income, is from consumers all over the country. But 0.25 percent, that 20 people is one quarter. That's Virginia. That's not a fair analysis. Virginia is the only place that the Westmont Ashore Pump operates. And, Your Honor, to discuss the marketing, in their brief, they claim— Where does Westmont, your client, get it? What's the analysis? Is there analysis in the record what states you get your customers from? In the record, we have similar statistics to them. I don't recall off the top of my head, but it is at least as de minimis, if not more. But I can tell you this, Your Honor. I can tell you that they claim that we do Internet advertising. So if a business is trying to expand and they have a low success rate, they're denied the protection of their marks because they haven't succeeded. This is an expanding market. This company on the West Coast is in two states with their facilities. But they're seeking people from everywhere. And that's where they derive their income, from the people that come from everywhere. Just like any business, Your Honor, but they have not been successful at it. Not like the donut shop and not like the hamburger store. In today's world, Your Honor, that would be online as well. But I thought there was something in the record that said that the majority, not even Oregon, the majority of their clients come from California. 82.6 percent, I believe, from California and Oregon. And is there any cases that discuss this whole, the market being the Internet? Yes, Your Honor. There are cases, and Professor McCarthy, and those cases, including ones from within the Fourth Circuit. And I think probably the best place to start, well, I'll start with the case, then I'll get to Professor McCarthy. The most recent case to address this within the Fourth Circuit is actually a case that has, where our facts are actually far superior. That is the case from Maryland, the Applause Product Group LLC versus Showtime Events. And in that case, unlike here, the defendants were actually aware of the plaintiff's mark. They were both entertainment and event companies that actively used websites, social media, online advertising. But importantly, just like in this case, they were deemed still local because their services required in-person contact. And what that meant was when someone came to engage in the services, they had to deal with a person directly in a specific location. And so all this Internet and online stuff ultimately didn't amount to anything in that case, despite being greater in this case. And what the court said there, Your Honor, is – one second, I've got the line here – quote, while both companies advertise on the Internet and social media, their business models are inherently local, providing services that require in-person contact within specific, distinct geographic areas. And, Your Honor, that's this exact case. During – what's interesting about this case is both parties are factually saying the same thing. And what they're both saying is this is a localized, on-site business. Sure, they'll take all comers from everywhere, but in reality, they tend to be near their loved ones. They tend to be near their home. There are outliers. You are a little bit alighted over the most important part. It has to be on-site marketing. In other words, if you go back to Don Donut, that was the whole portion, that all the marketing was done on the retail site. That's where the mark was. It said, as long as a plaintiff and defendant can find their use of the mark, Don, in connection with the retail sale of baked goods to their present separate trading areas, it is clear no public confusion is likely. And so, in that case, the only marketing was the retail mark at the locations. And so the court said there's no likelihood. But that's not true about retirement systems. And, Your Honor, what – They don't even rely on a sign in front. In other words, where people drive by and say, oh, I see Westmont, they probably go online to see what's – But, Your Honor, respectfully, and the undisputed evidence is, they do locally. And they made a point in their reply brief saying that we presented no evidence that our primary focus is in direct mailing, personal contact, and not online advertising. But, Your Honor, it's clear as day in both the deposition and the declaration. Joint Appendix 3242-43, which is the deposition testimony of the person in charge of this for RUI, and Joint Appendix 1932 make clear that signage, materials, direct mailings is the focus. There is no focus on advertising outside of Virginia. Everything is targeted at local relationships. They have a website that promotes their facilities. But there's no activity other than having a website that directs you to call someone to schedule an in-site person visit on site to come to the facility. You can buy nothing on the Internet. You can't even sign up on it. And what you have to do is come to the site, tour it, sample it, see if you want it, determine it based on the location. What's the relevance of the fact that nursing homes are reviewed online? If a bad thing happens at a nursing home, a consumer can easily find that information. I know that, you know, somebody wanders off, there's a bed sore, you Google the nursing home, that's the first thing that comes up. And I would imagine that if something happened at Westmont in Virginia and there was a Google search, if it would necessarily pop up in any Westmont senior living search, is that not confusion? Isn't that exactly why marks are protected? Your Honor, that's a good question. It's not what that is is not actual consumer confusion of someone making a purchasing decision. That is online information. And that raises us back to something else Professor McCarthy and the other cases say, which is this is not a theoretical exercise. When did this happen? Who is the person who is confused? What's the actual evidence? Theoretically, that could potentially occur, but there's no indication that someone is making a purchase decision that, according to Westmont Living's own president, this is their process and procedure, their admitted process and procedure. The whole thing begins with a phone call. Perhaps they get the number from the Internet, but it begins with a phone call. Then they and their family come visit, take a physical tour, taste the food, meet the staff, look at model apartments. They get a physical and mental assessment from a nurse or a physician, and then they discuss the finances, make multiple site visits, none of which is done online, all of which is done on site. So, Your Honor, this ultimately comes down to the fact that and that's Joint Appendix 2352 to 55, which is their own president's testimony of Westmont Living. And this this all comes down to the fact that the actual decisions are being made on a localized basis, thereby eliminating any possibility of confusion in the only relevant market, which is where they operate. Yes, both companies promote on the Internet, but you can't buy or do anything on the Internet other than call someone to set up a localized visit. And the way these actually operate shows the distinct separate markets. And if you look at the cases, you know, Whataburger was Virginia versus Texas. This is California versus Virginia. Yeah, well, Whataburger were two hamburger stands. And we also made clear made clear that the geographical analysis is not the only analysis. It's just an important factor. True. But you also make clear, Your Honor, respectfully, that's that's all that was considered by the district court in this case. In other words, the nine factors. My suggestion is not that you're right or wrong. My suggestion is that there's this is a fact intensive question on the likelihood of confusion. And all these facts you're citing are disputed. And we should not have a summary judgment determined just on whether this marketing around the country produces income for the for the facilities. If it produces income for the facilities, that's where they're marketing. It's not where the service is actually handed. Because you can't have a lot of facilities where you just have a single or double facility. Disney World, I mean, they market all over. They only provide the service in Florida or in California. But they market all over the country because that's where they get their customers. And we wouldn't suggest because they're a limited facility down there that that's their market. Their market is determined by where they get their money from the customers based on their marketing. And they market with the trademark all over the country with the idea of taking anybody they can get. And the fact of the matter, this record does show they get people from the East Coast, as a matter of fact. And in competing for those people on the East Coast, they're competing with Woodmont. You're a Woodmont. There is some de minimis overlap, as Judge Young found it at most. But, Your Honor, I think under their theory of the case in the Internet age, geography can never be dispositive. And there still is a place. It depends on the market. Why don't we go down to the factors? You know, we have nine factors to consider these things, including the geographical. And, of course, the hamburger case made that point explicitly, that geographical is important, but it's not the only thing we look at. And the question I have is it depends. I mean, we're talking about a donut shop that advertises only from its retail store with its mark and is a bakery where people, the radius of service is 25 miles. That was going donut. But that isn't the way a retirement facility operates. And, Your Honor, for a website that, by definition, is only promotional, Professor McCarthy in Section 2630.50 says, and I think this is a succinct summary of my position, merely because a website featuring a trademark can be accessed on computers from Florida to Alaska does not mean the trademark is known and established in those locations. It's pretty clear. They can see this advertising in China.  The Internet is just relying on the Internet is too broad. But the Internet is a factor. And on the Internet, they can focus in particular in the country. And I just don't think that helps you in anything. Your Honor, and Professor McCarthy continues, knowledge among persons in the territories at issue must be proven by evidence, not just assumed. If you look at what they have, they've said a lawyer went to a place for mom page, which, by the way, a place for mom we only accept referrals from. But a place for mom, they type something in and they see two names together. That's not evidence, Your Honor, respectfully. There's no evidence of any person actually doing that. And there's no evidence that those 0.29 percent of people who happen to be from Virginia visit a website are making any purchasing decisions based on it. You don't think somebody going online seeing Westmont, your Westmont and their Westmont on the same page, and that happens incidentally, that that isn't a likelihood of confusion? That's two names on an Internet page out of context. They're both from retirement communities, and they appear, both of them appear there. If they search on Google and they see both the names, the evidence from both sides has been that people make this decision to be locally near loved ones. Wherever the location, maybe this will help, wherever the location is, Your Honor, whether it's Timbuktu, Virginia, California, they decide where they're going to go, and then they look for facilities. They don't say, you know, I'm a North Carolinian. I'm from North Carolina. I'm not just going to go my final destination arbitrarily to California because I see something special online. People have in mind where they want to go. They make a location-based choice, and that's not actually causing any confusion. The question is, does the Internet eliminate the meaning of geography? And I submit to you, no. Okay. Thank you. Thank you. And briefly on the survey, Your Honor, the survey assumes geography. If you look at the express language in my citation in the Joint Appendix, in that survey he assumed geography and acknowledges that the marks are not well known. It's irrelevant to this issue, completely irrelevant. I cited that. It's in the brief. I see your time's up. Sorry, Your Honor. Thank you. Thank you, Your Honors. Ms. Carroll. Thank you. I just want to make two very quick points. First, the evidence in the record is so contrary to the argument about the advertising of the West Minot Short Pump being localized. There's evidence from both parties' principles saying that the Internet is the way in which this business and this industry markets. Because, as Your Honor points out— Well, let me ask you this. He makes his point regarding that this is not a business where you're going to go buy a product on the Internet. This is a business where somebody's going to look it up. That's to your confusion, Your Honor. Somebody's going to look it up on the Internet. They're going to say, oh, we would like to come in and learn some more information about your facility. He makes this argument. I'm curious to see your response to this whole confusion, because he says we're advertising on there, but you can't sign up. You have to come in for a visit. There's no exchange done on this website. So my response to that is, as Your Honor has pointed out earlier, that these are potential customers. This is how they get their customers to come in and look at their website—I'm sorry, look at their facility. So they use the website first as their ability to attract potential customers from every state in the country. Because, as this Court has pointed out during this argument, yeah, these people who want to retire go to different states for many different reasons, most of which to be in your family or to have a good recreational life. So that's the confusion. We have evidence in the record, tons of it, that says when a potential customer types into Google Westmont Living, which is a parent's name and trademark, they are shown Westmont at Shorepump. Now they're confused. Oh, Westmont at Shorepump must be affiliated with Westmont Living. So let me give them a call. That may be a facility I want to take a look at. So the confusion is based upon having the marks be exactly the same. The same services are provided, the retirement living services, and it's the type of industry where people are going to move around, and so they are looking. Are there any data to show how many out-of-staters go to the Virginia Westmont? Yes, because there are Google Analytics that are in the record from both sides. Give us a recollection of what that shows. So the record shows that residents from California. I'll use an example. California. I'm talking about anything outside of Virginia. Outside of Virginia, there are tens of thousands of residents that go to the Westmont website, Westmont at Shorepump website. How many people actually ended up going to do the out-of-staters went to Westmont at Shorepump? There were at least thousands, at least, because I know. They have thousands in their facility, do they? Yes. Are you referring to hits on the website, or are you referring to? I think the question is about how many people from other states are in the facility, living in the facility. I think that's the question. Yes. There's evidence in the record as to how many out-of-state residents are living in the Westmont at Shorepump facility. I don't have those numbers with me, but I know that what I was responding to was hits on the website. Do they deliberately market outside of Virginia? Yes, they deliberately market outside of Virginia. And that's in the testimony of Elizabeth Kolnick, and where she specifically says that all of the website advertising is directed across the country for the very reason that we've discussed here today, that their target market is retirement-age people that live in every state in the country because they move. But I think there's something in the record where you all acknowledge that your target market is California. No. If you look at the deposition of Andy Plant, and it's throughout his entire deposition, he specifically explains why the market is the entire country. But 82% of your clients are from California, not even from Oregon. Is that correct? That may very well be. However, 20 residents just from Virginia alone, not mentioning the East Coast, which is a much higher number, but 20 residents from Virginia have moved to the Westmont facility in California to the tune of over a million dollars. And we have tens of thousands of hits just from Virginia alone on our website that is attracting potential customers. So if you look at the Gumphrey decision… The relevance wouldn't even be just Virginia. The relevance would be whether you have a national mark. And so the question would be who did you get from Florida, who did you get from Arkansas, who did you get from New York? Yes. And we're looking at the engagement of the two businesses in competition for customers. That's exactly right. The competition for customers, it's not the ultimate service. It's getting the customers who are going to provide the income. And the customers are sought in the first instance usually by a search. Exactly. Those potential customers are from all over the country. And the Google Analytics evidence that's in the record from both parties shows that the customers… And now I'm just going to focus on Westmont's Google Analytics. But that shows customers from every state in the country accessing their website, accessing Google searches, and accessing a place for mom. Because there's a company that analyzes it and shows how many people have accessed it. And it's tens of thousands of potential customers accessing from all the states outside of California and Oregon to find potential retirement homes. So these are our potential customers. They're across the country. And those, too, are Westmont and Shore Pump's potential customers. That's in the deposition of their senior vice president of sales where she says, yes, our customers are national because they move to be near their families. Or they move because they want a better climate. Or they move because they want to see, you know, beautiful scenery. That is evidence from both sides says those exact things, that this is a national market. Westmont in California or Westmont in Virginia? That's a hard question. I think they both have beautiful scenery, I must say. I've been to both. And I really do enjoy them both. And I love this city. I see your red lights. Okay. Thank you all very much. Have a great day. All right. Do you want a break? Okay. Yeah. We'll come down to Greek Council and take a short recess. This honorable court will take a brief recess. Thank you.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Nicole G. Berner